# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 17-1361

RICHARD M. SIMON, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued October 30, 2018[1]                                    Decided December 20, 2018)

*Christian A. McTarnaghan* with whom *Amy F. Odom*, both of Providence, Rhode Island, was on the brief for the appellant.

*Michael G. Imber*, with whom *Meghan Flanz*, Interim General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Edward V. Cassidy, Jr.*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before DAVIS, *Chief Judge*, and ALLEN and FALVEY, *Judges*.

ALLEN, *Judge*: The appellant Richard M. Simon served the Nation honorably in the United States Marine Corps. In this appeal, which is timely and over which the Court has jurisdiction,[2] he challenges a May 1, 2017, Board of Veterans' Appeals (Board) decision that found no clear and unmistakable error (CUE) in a September 3, 1974, regional office (RO) rating decision that reduced his disability rating for PTSD from 30% to 10% based on a single examination suggesting that his condition had improved.[3] He now attacks the 1974 decision on a collateral basis, arguing that VA committed CUE because it applied the law concerning rating reductions incorrectly.

---

[1] The Court held oral argument in this matter at the Tampa Law Center of Stetson University College of Law in Tampa, Florida. We thank both Stetson and Florida's Second District Court of Appeal, whose courtroom we used, for their hospitality.

[2] *See* 38 U.S.C. §§ 7252(a), 7266(a).

[3] *See* Record (R.) at 2–36 (VA rated the appellant's disability as "anxiety reaction" in the rating decision that is now under collateral attack. VA later characterized his condition as "posttraumatic stress disorder." Because both ratings refer to the same disability, and for the sake of clarity, the Court will refer to the appellant's disability only as "PTSD.")

To decide this appeal, the Court must consider the meaning of 38 C.F.R § 3.344 (1974), a regulation providing that when an examination shows improvement in a claimant's disability, VA must "handle [the] case[] . . . so as to produce the greatest degree of stability of disability evaluations."[4] This regulation provides additional procedures that VA must follow before reducing a veteran's disability rating. When this heightened burden applies, the rating is subject to reduction becomes entitled to a form of "heightened procedural protections." But the regulation, and consequently these protections, only apply "to ratings which have continued for long periods at the same level (5 years or more)."[5] The principal question before the Court is the scope of this provision's application. The matter was referred to a panel of the Court, with oral argument, to decide whether the Board properly applied 38 C.F.R. § 3.344 when it found no CUE in the 1974 decision. As we explain, the Board was correct that § 3.344's rating reduction protections did not apply to the appellant in 1974. Therefore, we will affirm the Board decision on appeal.

## I.    OPERATIVE FACTS AND PROCEDURAL HISTORY

The appellant served in the United States Marine Corps from January 16, 1967, to February 29, 1968. He was stationed in the Vietnam demilitarized zone and engaged in fierce combat with the enemy. The appellant reports that he endured frequent mortar bombardment, witnessed the death of several close friends, and killed an enemy soldier by stabbing him to death.[6] Because of these experiences, the appellant was hospitalized for the latter part of his service. In January 1968, a Physical Evaluation Board determined that appellant was unable to perform his duties because of his condition and recommended separation from the U.S. Marine Corps.

In a March 1968 RO rating decision, VA granted the appellant service connection for PTSD, effective March 1, 1968, the date of the appellant's discharge, with an initial rating of 50%.[7] A few months later, in June 1968, VA attempted to schedule the appellant for an initial postservice

---

[4] 38 C.F.R. § 3.344(a) (1974).

[5] 38 C.F.R. § 3.344(c).

[6] R. at 2026.

[7] R. at 465.

PTSD evaluation. However, he informed VA that he was living and working out of the area and could not undergo an examination. VA granted him an extension.[8]

In July 1969, more than a year after his separation, the appellant underwent his initial PTSD examination.[9] The examiner noted that the appellant was "moderate in the neurotic sphere," but that his "stresses [were severe] in the past."[10] The appellant told the examiner that he was "functioning satisfactorily at his job" and that, since experiencing his stressors, he had "gradually began to feel somewhat better."[11] Accordingly, in an October 1969 rating decision, VA reduced the appellant's PTSD rating from 50% to 30%, stating that the appellant's disability appears to be improving.[12] The appellant did not appeal this determination and it became final.

Less than 5 years later, in August 1974, the appellant underwent another VA PTSD examination, during which the examiner remarked that the appellant "is functioning rather adequately."[13] The examiner noted that the appellant was not satisfied with his job because it was not challenging enough given the marketing degree he earned after his separation.[14] Based on this new evidence, the RO decided that "the current examination shows a good industrial and social adjustment" and reduced the appellant's PTSD rating from 30% to 10%, effective December 1, 1974.[15] The appellant did not appeal this decision either and it too became final.

In August 2014, more than 40 years after the RO reduced the appellant's rating, he asked VA to revise the 1974 decision on the basis of CUE.[16] He argued that because he had a PTSD rating of 50% from 1968 to 1970 and a rating of 30% from 1970 to 1974, he had maintained a rating of *at least* 30% for longer than the 5-year period outlined in the regulation. He claimed that when VA

---

[8] R. at 2036–37, 2046.

[9] R. at 2022–31.

[10] R. at 2028–30.

[11] R. at 2028.

[12] R. at 2016–17.

[13] R. at 1938.

[14] *Id.*

[15] R. at 1934.

[16] R. at 831.

reduced his rating below 30% in the 1974 decision, it committed CUE by not affording him the procedural protections provided in § 3.344.[17]

In response, the RO issued an April 2015 decision in which it concluded that no revision was warranted.[18] The appellant filed a May 2015 Notice of Disagreement (NOD), continuing to argue that VA did not employ the heightened rating-reduction procedures to which he was entitled under § 3.344.[19] After VA issued a Statement of the Case (SOC) continuing the denial, the appellant perfected his appeal to the Board. Then, on May 1, 2017, the Board issued a decision finding no CUE in the 1974 rating decision. In reaching its conclusion, the Board determined that 38 C.F.R. § 3.344 did not apply to the appellant's PTSD rating in 1974 because that rating "did not continue at the same level for five years" and, therefore, "had not become stabilized."[20] This appeal followed.

## II.    ANALYSIS

The appellant did not challenge the 1974 RO rating decision reducing his PTSD rating from 30% to 10% within the time permitted to file a direct appeal. As a general matter, when VA renders a decision that is not appealed within the statutory period, that decision becomes final.[21] There are limited avenues by which a claimant may revisit a final decision. For example, he or she may reopen such a claim by submitting new and material evidence.[22] And, as appellant has done here, a claimant may move to revise such a final decision on the basis that it contains CUE.[23] To address the appellant's appeal, we first describe the legal landscape concerning CUE. Then we turn to how these principles apply in this appeal.

---

[17] *Id.*

[18] R. at 587.

[19] R. at 489.

[20] R. at 33.

[21] *See* 38 U.S.C. §§ 7252, 7266(a)(1).

[22] 38 C.F.R. § 3.156(a) (2018).

[23] 38 U.S.C. §§ 5109A(a), 7111(a); *see DiCarlo v. Nicholson*, 20 Vet.App. 52, 56 (2006); 38 C.F.R. §§ 3.105(a) (2018), 20.1400–1411 (2018).

### A.    *The CUE Analysis Framework*

When a final decision contains CUE, that decision may be reversed or revised, resulting in correction of the error effective the date of its commission.[24] CUE is established when (1) either the correct facts as they were known at the time were not before the adjudicator, the adjudicator made an erroneous factual finding, or the statutory or regulatory provisions extant at the time were incorrectly applied; (2) the alleged error is "undebatable," rather than a mere "disagreement as to how the facts were weighed or evaluated;" and (3) the error "manifestly changed the outcome" of the decision.[25]

It is not easy to establish CUE in a final decision. We have held that an error is "undebatable" when "reasonable minds could only conclude that the original decision was fatally flawed at the time it was made."[26] In other words, "CUE is a very specific and rare kind of 'error' . . . of fact or law, that when called to the attention of later reviewers compels the conclusion, to which reasonable minds could not differ, that the results would have been manifestly different but for the error."[27]

When assessing the Board's CUE determination, the Court "cannot conduct a plenary review of the merits of the original decision."[28] Rather, the Court's overall review of a Board decision finding no CUE in a prior, final decision is limited to determining whether the Board's finding was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[29] and whether it was supported by an adequate statement of reasons or bases on all material issues of fact and law.[30] But the components of a valid CUE finding are subject to review under

---

[24] 38 U.S.C. §§ 5109A, 7111; *see DiCarlo*, 20 Vet.App. at 54–58; 38 C.F.R. §§ 3.105 (2018), 20.1400–1411 (2018).

[25] *Russell v. Principi*, 3 Vet.App. 310, 313–14, 319 (1992); *see Simmons v. Wilkie*, No. 16–3039, __ Vet.App. __, __, 2018 U.S. App. Vet. Claims LEXIS 1265, at *8-*9 (Sept. 20, 2018); *King v. Shinseki*, 26 Vet.App. 433, 439 (2014); *Bouton v. Peake*, 23 Vet.App. 70, 71–72 (2008); *Damrel v. Brown*, 6 Vet.App. 242, 245 (1994); *see also Bustos v. West*, 179 F.3d 1378, 1380–81 (Fed. Cir. 1999).

[26] *Andrews v. Principi*, 18 Vet.App. 177, 181 (2004) *aff'd sub nom Andrews v. Nicholson*, 421 F.3d 1278 (Fed. Cir. 2005) (quoting *Russell*, 3 Vet.App. at 313–14).

[27] *Fugo v. Brown*, 6 Vet.App. 40, 43 (1993).

[28] *Andrews*, 18 Vet.App. at 181; *see Archer v. Principi*, 3 Vet.App.4 33, 437 (1992).

[29] 38 U.S.C. § 7261(a)(3)(A).

[30] 38 U.S.C. § 7104(d)(1); *see Cacciola v. Gibson*, 27 Vet.App. 45, 59 (2014); *King*, 26 Vet.App. at 439.

the standards applicable to each.[31] Of particular relevance here, whether an applicable regulation was correctly applied or interpreted is a question of law, which the Court reviews de novo.[32]

The appellant argues that the Board misinterpreted 38 C.F.R. § 3.344 when it found the regulation inapplicable to the reduction of his PTSD rating in 1974.[33] The Board held that § 3.344 provides rating protection only when a veteran has the exact same disability rating for at least a 5-year period.[34] The appellant finds this reading too narrow. He suggests that the regulation protects any baseline level of symptomatology that exists for at least 5 years. For example, under the appellant's logic, if a veteran maintains a rating of *at least* 50% for 5 years, that 50% rating receives heightened protections even if the actual rating percentage changed over that period. We turn now to whether that assertion is a correct reading of § 3.344.

## B. Rating Protection Under § 3.344

At its core, 38 C.F.R. § 3.344 reflects the common sense principle that the longer a veteran has a given disability rating, the more likely it is both that such a rating has stabilized and, therefore, that a veteran has come to rely on continuing to receive a corresponding amount of monetary benefits. In recognition of this principle, VA imposed on itself through the regulation a heightened duty to show that a rating reduction is proper once such a rating has existed at the same level for a significant length of time. For example, when a new examination shows improvement, VA must review the entire record of medical evidence "to ascertain whether the recent examination is full and complete."[35] And if the recent examination showing improvement is "less full and complete than those on which payments were authorized . . . it will not be used as a basis of reduction."[36] Furthermore, with regard to diseases subject to temporary and episodic improvement, a veteran's rating will not be reduced on a single examination absent evidence that clearly shows sustained improvement. Lastly, before VA can reduce a rating for any disability entitled to

[31] *Simmons*, __ Vet.App. at __, 2018 U.S. App. Vet. Claims LEXIS 1265, at *9; *Hopkins v. Nicholson*, 19 Vet.App. 165, 167–68 (2005).

[32] *Simmons*, __ Vet.App. at __, 2018 U.S. App. Vet. Claims LEXIS 1265 at *9–*10; *Hopkins*, 19 Vet.App. at 168; *see also George v. Shulkin*, 29 Vet.App. 199, 2016 (2018); *Stallworth v. Nicholson*, 20 Vet.App. 482, 487 (2006); *Joyce v. Nicholson*, 19 Vet.App. 36, 43–44 (2005); *Andrews*, 18 Vet.App. at 182.

[33] Appellant's Brief (Br.) at 5.

[34] R. at 33.

[35] 38 C.F.R. § 3.344(a) (2018).

[36] *Id*.

heightened procedural protections under § 3.344, it must first consider whether that improvement is reasonably certain to remain under the ordinary conditions of life.[37] The point is that when a rating qualifies for these heightened protections, it is more difficult for VA to implement a reduction. Here, it is undisputed that VA, in 1974, did not afford, or even discuss, these procedural protections when reducing the appellant's PTSD rating to 10%. The resolution of this appeal hinges solely on whether the appellant's PTSD qualifies for such rating protections.

It is well established that "[r]egulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure."[38] If the plain meaning is clear, then that interpretation controls and that is the end of the matter.[39] Finally, when assessing the plain meaning, words are given "their ordinary, contemporary, common meaning" absent some indication that they were meant to mean something else.[40]

Subsection (c) of § 3.344 establishes when the heightened protections of the regulation apply. In 1974, as today, this provisions read as follows:

> **(c) Disabilities which are likely to improve.** The [rating protection] provisions of paragraphs (a) and (b) of this section apply to ratings which have continued for long periods at the same level (5 years or more). They do not apply to disabilities which have not become stabilized and are likely to improve. Reexaminations disclosing improvement, physical or mental, in these disabilities will warrant reduction in rating.

The appellant concedes that his PTSD rating did not continue at a specific percentage for 5 years or more.[41] Nevertheless, he argues that § 3.344 applies to the 1974 reduction of his PTSD rating because the periods for which he was rated at 50% and 30% may be combined to reach the 5-year mark, and that the regulation protects the lowest rating awarded within those 5 years. The Secretary argues that combining different rating periods is permissible under the regulation, but asserts that the rating protection can be earned through such combination only when the disability rating has increased within the 5-year period, i.e., when the condition is worsening.[42] Per the

---

[37] *See id.*

[38] *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015); *see Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993).

[39] *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006).

[40] *See Williams v. Taylor*, 529 U.S. 420, 431 (2000); *Prokarym v. McDonald*, 27 Vet.App. 307, 310 (2015).

[41] Appellant's Br. at 7.

[42] Secretary's Br. at 18 (arguing that § 3.344 rating protection may apply to a rating that changed within the 5-year period if the condition is worsening, but not if it is improving).

Secretary's reading of § 3.344(c), the appellant's condition (1) never stabilized at either 50% or at 30%, and (2) was improving, not worsening. He argues that because the appellant's PTSD was improving, the appellant can't combine the periods in which he held different ratings and, therefore, in 1974 was not entitled to the rating protections of § 3.344.

As discussed in detail below, the Court rejects both parties' interpretations. The plain language of the regulation makes clear that the 5-year requirement can't be met by combining 2 periods with different rating percentages no matter whether the ratings fluctuated upward or downward. The Court holds that a rating becomes entitled to heightened procedural protections under § 3.344(c) only when it has existed at the exact same percentage for at least 5 years.

The first two sentences of subsection (c) are the operative provisions. The opening sentence affirmatively defines the *ratings* to which the enhanced protections of § 3.344 apply. The second sentence has the same aim, but approaches the matter by providing examples of *disabilities* that do *not* merit such protections. The regulation's use of *rating* in the first sentence of subsection (c), and *disabilities* in the second sentence, highlights the subtle difference between "disability ratings" and "disabilities" generally. The former describes the numerical value that VA assigns based on what it perceives is the "average impairment in earning capacity resulting from [a disability]."[43] The latter is a more holistic characterization that takes into account not only the assigned rating, but also other descriptors, including explanations of the disability within medical records.[44] Contrary to the parties' contentions, the best reading of the second sentence of subsection (c) is to prevent the protections from applying to disabilities where slight improvement is shown, or is expected in the future, but when such improvement does not reach a level that warrants a lower rating in terms of a percentage on the rating scale. We conclude that, taken together, these regulatory provisions are clear that § 3.344's protections did not apply to the appellant in 1974.

We begin by emphasizing that the heightened duties outlined above apply only to "*ratings* which have continued for long periods at the same level."[45] The applicability of the regulation does not hinge on whether a *disability*, in some larger, holistic sense, has remained at the same level.

---

[43] 38 C.F.R. § 4.1 (2018).

[44] *See Thun v. Peake*, 22 Vet.App. 111, 115 (2008), *aff'd sub nom. Thun v. Shinseki*, 572 F.3d 1366 (Fed. Cir. 2009) (noting that extraschedular consideration is required when the assigned *rating* does not fully contemplate the actual disability of a veteran.).

[45] § 3.344(c) (emphasis added).

Rather, based on the plain language and the surrounding provisions, the word *ratings* refers to specific percentage grades for disabilities per VA's rating schedule. For starters, the dictionary defines a "rating" as a "classification according to grade or rank."[46] Thus, a plain reading associates the word "rating" with the grade VA assigns to a disability. The appellant suggests that the word "rating" refers to some baseline level of symptomatology or an overall disability picture. But that contradicts the ordinary definition of the term.

The Court's understanding in this regard is harmonious with how Congress and VA use the word "rating." For example, in 38 U.S.C. § 1155, the statutory provision granting VA authority to create and modify the rating schedule, Congress states that "[VA] shall adopt and apply a schedule of ratings . . . [that] provide[s] . . . grades of disability . . . upon which payments of compensation shall be based." That section then continues by specifying that the schedule is to be constructed with percentage grades in 10% increments. The tabular rating schedule VA created under this authority confirms this reading of "rating." The schedule is comprised of two columns, with the specific diagnosis or symptomatology on the left and the corresponding rating percentage on the right.[47] The "rating" column on the right contains only numbers relating to the symptoms found on the left.[48] So, when VA is adjudicating a disability claim, it matches the symptoms to a percentage. Symptomatology may increase in severity without becoming so severe as to reach a higher rating percentage. Thus, symptoms and ratings are entirely distinct concepts and one cannot be shorthand for the other, as the appellant suggests. With the understanding that the applicability of § 3.344 is premised on how long a *rating* has been in place, as opposed to how long some baseline symptomatology has existed, we can analyze exactly how long a rating must exist before it becomes entitled to heightened protections.

For now, let's stick with the first sentence. The phrase "continued . . . at the same level" is clear and specific. The common meaning of this phrase is not in doubt. The dictionary defines the word "same" as "identical with what is about to be or has just been mentioned."[49] Another

---

[46] THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, 1602 (2d ed., unabridged) (hereinafter RANDOM HOUSE).

[47] *See, e.g.,* 38 C.F.R. § 4.71a (Diagnostic Code 5276) (2018).

[48] *Id*.

[49] RANDOM HOUSE at 1696.

dictionary defines "same" as "not changing or showing change."[50] The word "level" means "a degree of attainment" or "a relative position in respect to some norm in a scale of estimating."[51] This language makes clear that § 3.344(a) applies when a rating exists for 5 years without changing its degree or position on the rating schedule. In other words, if the appellant's initial rating was 50%, it cannot change and must be "identical" to 50% after 5 years. We conclude that the ordinary or common meaning of "same level" does not contemplate combining periods of time when a person has different ratings above a minimum threshold; rather, the person's rating must be *exactly* the same for 5 years to qualify for the protections.

The second sentence of subsection (c), which describes the type of disabilities that do not qualify for rating protection, reinforces our conclusion. It provides that rating protection does *not* apply to disabilities that have not stabilized and are likely to improve.[52] The word "stable" means "likely to continue or last; firmly established; enduring or permanent."[53] And to "stabilize" means "to maintain at a given or unfluctuating level or quantity."[54] These definitions remove any doubt (although we had none) that § 3.344 does not apply to disabilities for which the ratings have changed or fluctuated.[55] And lastly, turning to the final qualifying clause of subsection (c), it says that rating protections do not apply to disabilities that are likely to improve. To "improve" means to "make better in quality."[56] This language does not need very much unpacking. Simply put, disabilities that got better, or are likely to, are not eligible for rating protections. Whether a disability has "improved" is not wholly dependent on the assigned rating, but rather is determined based on the full disability picture, which encompasses the type of disability involved, the ratings previously and currently assigned, and the entire record of medical evidence.

---

[50] THE NEW LEXICON WEBSTER'S ENCYCLOPEDIC DICTIONARY, 882 (1991 ed., unabridged) (hereinafter WEBSTER'S).

[51] *Id*. at 569.

[52] *See* § 3.344(c).

[53] RANDOM HOUSE at 1852.

[54] *Id*.

[55] Considering the inverse of this language, the dictionary defines "unstable" as "unsteadfast; inconsistent; wavering." RANDOM HOUSE at 2087. This definition, too, fits the interpretation that the rating protections do not apply to ratings that changed or fluctuated within a 5-year period.

[56] WEBSTER'S at 487.

Because the plain meaning of the regulation is clear it is controlling, we need not go further with the analysis. However, even if the appellant's proffered interpretation did not contradict the plain language of the regulation, we would still reject it because it leads to absurd results and is entirely inconsistent with how the words in the regulation are used in the "real world."

To illustrate the absurdity, consider a situation in which a veteran, "Vanessa," received an initial disability rating of 100%. Under the appellant's reading of § 3.344, even if VA reduced Vanessa's rating by 10% every year, leaving her with a 50% rating after 5 years, her rating would still be entitled to protections if VA attempted to reduce her rating below 50%. Indeed, the appellant argues that he "need only to have been rated at a level no lower than a particular disability level for five years."[57] Applied to Vanessa, she was rated at a level "no lower than" 50% for at least 5 years, even though her rating changed every year. The logical conclusion of this rationale is that, once a veteran has been service connected for at least 5 years, he or she would automatically qualify for rating protection at whatever his or her lowest rating was over those 5 years. This would result in every service-connected disability becoming "stabilized" after 5 years. This interpretation requires the Court to ignore the several qualifying phrases within subsection (c) that intentionally limit protection to those ratings that have not changed in a long time and are unlikely to change in the future. The appellant's proffered interpretation also asks us to ignore that the regulation includes an explicit exception for disabilities that are improving.[58] We shouldn't interpret the law to lead to such an absurdity.[59]

In addition, the appellant's interpretation is fundamentally inconsistent with the common way in which we use the words that are contained in the regulation. For example, assume you have an office in a 50-story building. If your office was on the 30th floor for three years and on the 50th floor for two years, you would never say that your office had been on the "same level"—the 30th floor—for five years. But that is what the appellant's argument as to the meaning of "same level" would dictate. And that is nonsensical. There simply is no way to contort the English language to read § 3.344(c) in a way that is consistent with the appellant's position.

---

[57] Appellant's Br. at 8.

[58] *See* § 3.344(c).

[59] *See Atencio v. O'Rourke*, 30 Vet.App. 74, 83 (2018).

Before turning back to the Board's decision, we pause briefly to consider the Secretary's position. Recall the Secretary's suggestion that § 3.344(c) provides rating protection when a veteran's ratings have been increasing over time even though the ratings have not been the same.[60] So, for example, if a veteran was rated at 50% for 3 years and then 70% for 2 years, the Secretary would say that the veteran is entitled to the rating reduction protections of § 3.344 if his or her rating was to go below 50%. Of course, the Secretary is generally free to provide greater procedural protections to veterans than his own regulations provide, but his interpretation of the regulatory language here is as inconsistent with § 3.344(c) as is that of the appellant.[61] Just as the English language does not support the appellant's position, it likewise does not support the Secretary's views for the reasons we have explained.

### C. The Board's Analysis of Section 3.344

We explained in the previous section that § 3.344 applies only to ratings that have remained at precisely the same percentage for 5 years or more. Next we must consider, through the lens of CUE, whether the Board applied the regulation properly in its decision now under collateral attack.

In the Board's May 2017 decision, it held that no error existed in the first prong of the CUE analysis—whether the RO in 1974 applied the law correctly— and, thus, found "no need to proceed to the second and third prongs of the CUE test."[62] When analyzing § 3.344, the Board held that the plain language explicitly "limits the provisions . . . to 'ratings which have continued for long periods of time at the same level' and note[d] that this section does 'not apply to disabilities that have not become stabilized."[63] It then held:

> [The appellant's] rating did not continue at the same level for five years. Instead, [he] was given three different ratings between his separation from service in 1968 and 1974, the latter two of which revised his rating down. This history is consistent with a disability that had not become stabilized, and thus should not have been afforded the protections of § 3.344(a).[64]

---

[60] *See, e.g.,* Secretary's Br. at 18.

[61] As the appellant notes, the Secretary has taken this same position in another appeal before the Court. *See Simunovich v. Shulkin*, No. 16-2604, 2018 U.S. App. Vet. Claims LEXIS 1379 (Oct. 17, 2018) (mem. dec.). The Court in that case accepted the Secretary's concession of error based on his interpretation of the regulation. *Id.* at * 11-*13. Of course, that memorandum decision is not binding here. *See* U.S. Vet. App. R. 30(a). This also answers the appellant's citation of this decision in support of his argument. In any event, today we authoritatively have defined what § 3.344(c) means and that interpretation is binding regardless of *Simunovich*.

[62] R. at 33.

[63] *Id*. (quoting 38 C.F.R. § 3.344).

[64] R. at 33.

Essentially, the Board held that because the appellant's rating did not continue at a single rating percentage for 5 years or more, his rating was not entitled to protection under § 3.344 in 1974. The Board highlighted that the appellant received three different ratings since separation, none of which were in place for 5 years or more. Further, the Board noted that the medical evidence suggests that the appellant's PTSD was improving. The Board correctly identified these facts as disqualifying the appellant's rating from protection. This analysis is spot-on with the Court's interpretation of § 3.344(c). In sum, the Board's decision is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law and it provided an adequate statement of reasons and bases explaining how it reached its conclusion.

## III. CONCLUSION

After consideration of the parties' briefs, oral arguments, the record on appeal, and the governing law, the Court AFFIRMS the Board's May 1, 2017, decision.